IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
6-10-2008
JUN 1 0 2008  TC
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

SHARP ELECTRONICS CORP.
1300 Naperville Dr.
Romeoville, IL 60446

CIVIL ACTION NO.:

Plaintiff

JURY TRIAL DEMANDED

v.

BIGSTON CORPORATION USA; and
BIGSTON CORPORATION
1590 Touhy Avenue
Elk Grove, IL 60007

**08CV3348
JUDGE ST. EVE
MAGISTRATE JUDGE DENLOW**

Defendants

## COMPLAINT

NOW COMES Plaintiff, Sharp Electronics Corp., by and through its attorneys, Fisher Kanaris, P.C. and for its complaint against Defendants, Bigston Corporation U.S.A. and Bigston Corporation states as follows:

### Statement of Jurisdiction

1.      Plaintiff, Sharp Electronics Corp. is a corporation incorporated under the laws of New York, with its principal place of business located at Sharp Plaza, Mahwah, NJ 07430. Hereinafter Plaintiff will be referred to either as Plaintiff or "SEC."

2.      Defendant, Bigston Corporation is a corporation incorporated under the laws of Illinois, with its principal place of business located at 1590 Touhy Avenue, Elk Grove, Illinois.

3. Defendant, Bigston Corporation USA was a corporation incorporated under the laws of Illinois, with its principal place of business located at 1590 Touhy Avenue, Elk Grove, Illinois.

4. In July 2006, Defendant Bigston Corporation USA underwent a business transformation and now does business as simply Bigston Corporation. Based upon this transformation that occurred after certain pertinent facts underlying this action, Plaintiff was compelled to name both entities, and will refer to them interchangeably as "Bigston" throughout the body of this Complaint.

5. The amount in controversy, without interest or costs, exceeds the sum or value specified by 28 USC §1332.

## General Facts

6. On or about March 7, 2003, Bigston and SEC entered into a contract ("the Contract") whereby Bigston would perform refurbishing services including, but not limited to, inspection, testing, repair and repackaging for SEC as to various SEC products and product lines. A copy of the Contract is attached hereto as Exhibit "A."

7. In furtherance of performance of the Contract, Bigston shipped products to be refurbished to a facility in Reynosa, Mexico ("Mexican facility"), where the work was often done by Bigston employees and/or employees or contractors of Bigston de Mexico - a Mexican company related to Bigston. This was expected under and set forth in the Contract.

8. Certain provisions of the Contract are pertinent to the claims set forth herein. They include, in part:

> 2. <u>Services</u>
> ***
> Refurbishing Services will at all times be performed by Servicer [(Bigston)] in a good and workmanlike manner in accordance with generally accepted standards prevailing in the industry, all applicable regulations and product safety requirements and in accordance with the standards and specifications set forth from time to time in Sharp service literature for the products ("standards and specifications") and pursuant to the procedures issued from time to time by Sharp for Refurbishing Services (the "procedures").
>
> 3. <u>Inventory Control</u>
> ***
> B. *** Servicer will be responsible for any discrepancy between the physical count and the book record of inventory subject to Refurbishing Services.... In the event that a loss of products, accessories and parts occur for which Servicer is liable to Sharp hereunder, Servicer's liability to Sharp shall be an amount equal to Sharp's inventory cost for the products, accessories and parts damaged or lost as reflected in Sharp's books at the date such damage or loss occurred.
>
> 9. <u>Relationship Between Parties</u>
> ***
> All persons employed or utilized by Servicer in connection with the provision of Refurbishing Services will be considered employees of Servicer....

9. The Contract was entered into between the parties, both of whose representatives at the time were working at locations within Illinois, and there is no "choice of law" provision in the Contract.

10. On or about June 8, 2006, a fire originated at the Mexican facility, causing extensive damage to Plaintiff's personal property, inventory, tools, machinery and other property, and causing Plaintiff to incur a loss of business income and additional expenses related to the loss.

## COUNT I – NEGLIGENCE

11.     Plaintiffs incorporate herein by reference Paragraphs 1-10 of this Complaint as though fully set forth herein.

12.     At all times relevant, Bigston owed SEC a duty to use reasonable care in the handling of its goods.

13.     Notwithstanding the foregoing duty, Bigston, by and through its direct employees, contractual employees, agents, servants and/or contractors committed one or more of the following negligent acts or omissions:

   a.   failed to store and handle batteries at the Mexican facility in a safe and proper manner; and

   b.   failed to maintain the Mexican facility in a safe and proper manner.

   c.   Failed to adequately instruct its direct employees, contractual employees, agents, servants, and/or contractors as to the proper ways to perform the tasks set forth in subparagraphs a and b above;

   d.   Failed to supervise its direct employees, contractual employees, agents, servants, and/or contractors in the performance of the tasks set forth in subparagraphs a and b above;

   e.   Failed to hire, contract with, or otherwise retain proper and qualified individuals or companies to undertake the tasks set forth in subparagraphs a and b above;

   f.   Failed to provide, establish, and/or follow proper and adequate controls so as to ensure the proper performance of the tasks set forth in subparagraphs a and b above;

   g.   Failed to adequately warn plaintiffs and/or others of the dangers and risks resulting from the careless and negligent failure to exercise reasonable care as set forth subparagraphs a and b above; and/or

      h.     Failed to perform the tasks set forth in subparagraph a in conformity with the prevailing industry and governmental specifications and standards.

14.    As a direct and proximate result of the negligence and carelessness of Bigston, Plaintiff sustained extensive damage to its personal property, inventory, tools, machinery and other property, causing Plaintiff to incur a loss of business income and additional expenses related to the loss in an amount in excess of $3,000,000.00.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants in an amount in excess of $3,000,000.00, plus interest, costs of suit, delay damages, attorney fees, and such other relief as the Court deems appropriate under the circumstances.

### COUNT II – BREACH OF CONTRACT

15.    Plaintiff incorporates herein by reference Paragraphs 1-14 of this Complaint as though fully set forth herein.

16.    SEC contracted with Bigston to perform various services with respect to its goods, including refurbishing services.

17.    As a result of its aforementioned negligent conduct and omissions, Bigston breached the Contract.

18.    Plaintiff has complied with all conditions precedent and pursuant to the Contract entered into with Bigston.

19.    As a result of the aforementioned breaches by Bigston, Plaintiff sustained extensive damage to its personal property, inventory, tools, machinery and other property, and caused Plaintiff to incur a loss of business income and additional expenses related to the loss, all resulting in an amount in excess of $3,000,000.00.

20. Bigston's negligence in failing to exercise due care in the handling of SEC's goods was in breach of the aforesaid legal agreement between Plaintiff and Bigston and said breach directly and proximately caused the damages sustained by SEC.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants in an amount in excess of $3,000,000.00, plus interest, costs of suit, delay damages, attorney fees, and such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

FISHER KANARIS, P.C.

BY: *[signature]*
JOHN R. SCHLEITER
LINDSAY E. DANSDILL
ATTORNEYS FOR PLAINTIFF

FISHER KANARIS, P.C.
200 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
Telephone (312) 474-1400
Fax (312) 474-1410

KENNETH T. LEVINE
OF COUNSEL ATTY. FOR PLAINTIFF
NELSON, LEVINE, de LUCA & HORST
Four Sentry Parkway, Suite 300
Blue Bell, PA 19422

Dated: June 10, 2008

E:\08-1542\Pleadings\Final Complaint.doc

JUN 28 2006 10:38AM    ST. PAUL TRAVELERS           913-881-8340           P.1



SHARP
SERVICES AND
SUPPORT GROUP
Sharp Solutions
for Sharp Customers

March 10, 2005

Mr. Paul Ohmae
President
Bigston Corp., U.S.A.
1590 Touhy Avenue
Elk Grove Village, IL 60007

Paul,

Enclosed are two signed original contracts regarding Refurbishing in Mexico.

Please return one signed copy to my office.

Thank you for your assistance. If you have any questions, please contact me.

Regards,

Charles T. Schaefer
Vice President
Group General Manager –
Services & Support Group

enclosures

C:   Y. Takeda (without enclosures)
     W. McGillicuddy (without enclosures)

Sharp Electronics Corporation • 1300 Naperville Drive • Romeoville, IL 60446 • (630) 226-2400 • www.sharpusa.com   be sharp

EXHIBIT
A

JUN 28 2008 10:38AM   ST. PAUL TRAVELERS            813-861-9340            P.2

# SHARP

March 7, 2003

Bigston Corporation USA
1590 Touhy Avenue
Elk Grove Village, IL 60007

Re:   Refurbishing in Mexico

Dear Sirs:

We have prepared this letter to confirm arrangements involving Sharp Electronics Corporation's ("Sharp") retention of Bigston Corporation USA ("Servicer") in connection with Servicer's performance of refurbishing services for Sharp at Servicer's maquiladora facility called Bigston de Mexico located at Ave. Fomento Industrial No. 1150, Parque Industrial Del Norte, 88730, Reynosa, Tam Mexico (the "Facility").

1. **Products.**   The products to be refurbished ("merchandise" or "products") will consist of those products returned by Sharp's retailer customers in various product lines that may include from time to time VCRs, DVDs, microwave ovens, camcorders, televisions, air conditioners, facsimiles, audio, calculators and organizers.

2. **Services.**   Servicer will refurbish at the Facility those products that Sharp may from time to time consign to Servicer for inspection, testing, repair, repackaging and return to Sharp in refurbished condition. Servicer's activities with respect to such products will consist of the following:

**SHARP**

- importation of products and receiving and verification
- importation of accessory and receiving and verification
- importation of parts and receiving and verification
- inspection and testing of incoming product
- product repair and refurbishing
- refurbished product to be repackaged
- export to Sharp's warehouse completed refurbished product
- pack and export to Sharp's warehouse scrap materials
- product, accessories, and parts inventory control
- inspection and testing of the products and accessories to confirm that they are functioning in accordance with standards and specifications and that all product performance features operate as originally intended; If upon inspection by Sharp and/or the Servicer, the products do not function as intended, Servicer will be responsible, without additional compensation, for any further rework of the products necessary to bring them into compliance with the standards and specifications.
- completion of all required reports

(all such services and activities being herein called the "Refurbishing Services"). Refurbishing Services will at all times be performed by Servicer in a good and workmanlike manner in accordance with generally accepted standards prevailing in the industry, all applicable regulations and product safety requirements and in accordance with the standards and specifications set forth from time to time in Sharp service literature for the products ("standards and specifications") and pursuant to the procedures issued from time to time by Sharp for Refurbishing Services (the "procedures").

3. Inventory Control.

   A. Servicer will receive and inspect products, accessories, and parts and packaging materials consigned by Sharp to Servicer for refurbishing as well as maintain proper records and controls, in accordance with the procedures, for products, accessories and

**SHARP**

parts in Servicer's possession. Such records as well as the products, accessories and parts will be available for inspection by Sharp.

B. Servicer shall take cycle counts of the products, accessories and parts and packaging materials inventory at the end of each month, and at such other times as Sharp may reasonably request. Servicer will be responsible for any discrepancy between the physical count and book record of inventory subject to Refurbishing Services and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. In the event that a loss of products, accessories and parts occurs for which Servicer is liable to Sharp hereunder, Servicer's liability to Sharp shall be an amount equal to Sharp's inventory cost for the products, accessories and parts damaged or lost as reflected in Sharp's books at the date such damage or loss occurred. (See Annex 3)

C. All scrap material derived from Refurbishing Services will be returned to Sharp.

4. Compensation.

A. As consideration for the performance of Refurbishing Services, Sharp agrees to pay Servicer a per unit fee determined as set forth in Annex 1 hereto. As provided in Annex 1, rates are subject to review and upon mutual agreement may be adjusted prospectively. Servicer will prepare invoices to Sharp on a weekly basis. The Servicer grants Sharp the right to inspect and audit the records of the Servicer which pertain to the refurbishment operation for the purpose of determining the accuracy of the amount of the invoice(s) with regards to hours worked or repairs completed and the billing rate.

B. Sharp agrees to receive a monthly invoice as a pass through charge related to the facility as set forth in Annex 2 hereto.

# SHARP

~~Tools and Packaging Materials~~ [redacted text] and will be returned by Servicer to Sharp upon the termination of this Agreement in their original condition reasonable wear and tear excepted.

[redacted text] remaining inventory will be returned by Servicer to Sharp upon the termination of this Agreement in their original condition.

6. **Maquiladora Documents.** The arrangements described herein will be set forth in documents between Sharp and Servicer consisting of service and bailment agreements that are customary for maquiladora operations involving A) the importation by Servicer of to be refurbished products to the Facility and B) the bailment of equipment and other materials provided by Sharp at the Facility.

7. **Compliance.** Servicer will perform Refurbishing Services in compliance with all applicable laws, regulations and ordinances and will obtain and comply with all licenses or permits required by law. Servicer will not remove, disconnect or negate at any time any safety performance, UL, FCC or FDA related feature on any product subject to Refurbishing Services. Refurbishing Services will be rendered in accordance with the standards and specifications and no modifications or alterations will be made on the products except as authorized by the standards and specifications.

8. **Taxes.**

   A. Servicer agrees to prepare, file and pay all taxes, including, without limitation, payroll taxes, income tax pursuant to Mexican Income Tax Law, asset taxes, social security

# SHARP

taxes, retirement fund (SAR) taxes, and other domestic or Mexican taxes and Infonavit fees, and any other applicable tax or fee under Mexican laws and regulations, including without limitation those related to employees supplied by Servicer.

B. Servicer will be responsible for ad valorem taxes associated with inventory (product, parts & accessories) remaining with the Servicer for more than 90 calendar. In the event that the ad valorem taxes are caused by Sharp's failure to provide service parts and/or accessories required to complete refurbishment in a timely manner, Sharp agrees to accept an invoice from the servicer for the ad valorem taxes paid by the servicer on the applicable inventory.

9. **Relationship Between Parties.** Servicer will at all times in the course of providing Refurbishing Services be an independent contractor as regards to Sharp, and this agreement does not create a relationship of agency, partnership or employment between parties hereto, and no act or obligation of either party shall in any way bind the other except as expressly set forth herein. Servicer has no power or authority whatsoever to sell, mortgage, create any lien upon or otherwise dispose of or in any way affect Sharp's exclusive ownership interest in the products, accessories and parts subject to Refurbishment Services. All persons employed or utilized by Servicer in connection with the provision of Refurbishing Services will be considered employees of Servicer and will in no way, either directly or indirectly, be considered employees of Sharp. Any taxes or contributions levied by or workmen's compensation insurance required under any local, state, federal or other law based upon payrolls of or employment by Servicer shall be the exclusive responsibility of Servicer.

10. **Term of Agreement.** This agreement shall continue for an initial term of five (5) years from its date and shall be automatically renewed for successive one (1) year periods thereafter, unless notice of termination is given by one party to the other at least 120 days prior to the termination date, or unless earlier terminated under any other provision of this agreement. This agreement may be terminated by either party at any time with or without cause upon not less than 120 days prior written notice to other party, provided that Sharp may terminate this agreement effective

# SHARP

immediately in the event that: Servicer attempts to assign this Agreement or any rights hereunder without Sharp's prior written consent; there is a material adverse change in Servicer's business or at the Facility or in the way Servicer performs Refurbishing Services; Servicer becomes insolvent or bankrupt; or Servicer falsifies any documents, record or claim, relating to Refurbishing Services. Upon termination Servicer will promptly return to Sharp and account for all products consigned to Servicer hereunder. Sharp reserves the right any time to discontinue, limit or withdraw products subject to Refurbishing Services without incurring any liability to Servicer.

11. <u>Confidential Information</u>. Servicer hereby agrees to keep in strictest confidence all confidential information which it may acquire in connection with or as a result of performance of this agreement relating to the products or the business of Sharp and not to publish, communicate, divulge or disclose to any unauthorized third party or parties any such information, without the prior written consent of Sharp, during the term of this agreement or at any time subsequent thereto.

12. <u>No Assignment</u>. Neither party may assign this agreement, in whole or in part without the other party's prior written consent.

13. <u>Force Majeure</u>. Neither party shall be held responsible for any delay or failure in performance of any part of this agreement to the extent such delay or failure is caused by fire, flood, explosion, war, embargo, government requirement, civil or military authority, act of God, act of embargo, act or omission of carriers, or any lockout, strike, labor trouble or other industrial disturbance, inevitable accident, export delays by governmental authorities or industry or trade association of whatever nature to limit its export or import of the products or any components thereof or another cause beyond its reasonable control. Any party excused from performance shall make a good faith effort to minimize the effect of the excused delay or non-performance.

14. <u>Changes</u>. Any changes to this Agreement must be mutually agreed to by both parties in writing.

Sharp Electronics Corporation • 1300 Naperville Drive • Romeoville, IL 60446 • (630) 226-6500 • www.sharp-usa.com    be sharp

# SHARP

To confirm your understanding and agreement to the above, please countersign and return the enclosed copy of this letter.

Very truly yours,

Sharp Electronics Corporation

By _____
Name: Charles T. Schuster
Title: Vice President
       Group General Manager
       Services & Support Group


Accepted as of the date hereof.
Bigston Corporation USA

By _____
Name: PAUL OMMAR
Title: President and CEO

Sharp Electronics Corporation • 1300 Naperville Drive • Romeoville, IL 60446 • (630) 226-2600 • www.sharp-usa.com   be sharp

# SHARP

## ANNEX 1

**Compensation Payable for Refurbishing Services**

1. Rates per unit by product category for:

| Product Category | Refurbishment Only | Inspection Only | Destruction Only |
|---|---|---|---|
| VCR | $3.00 | See #2 Annex 1 below | $0.50 |
| Fax (Ux) | $3.40 | See #2 Annex 1 below | $1.50 |
| TV | $4.05 | See #2 Annex 1 below | $1.50 |
| TV/Combo | $4.96 | See #2 Annex 1 below | $1.50 |
| Air Conditioner | $5.14 | See #2 Annex 1 below | $1.50 |
| Camcorder | $6.47 | See #2 Annex 1 below | $1.50 |
| DVD | $5.25 | See #2 Annex 1 below | $1.50 |
| Calc/Organizer | $2.10 | See #2 Annex 1 below | $0.10 |
| Audio | $4.50 | See #2 Annex 1 below | $0.50 |
| MWO (3 ATL Models) | $4.02 | See #2 Annex 1 below | $1.50 |

2. Servicer agrees that some products within the above referenced product categories will require inspection only services and as such Servicer will work with Sharp to investigate and introduce these programs. Servicer and Sharp will reach mutual agreement on these rates within the next 60 days.

3. Servicer agrees to continuously work with Sharp in developing methods of productivity improvement to enhance the refurbishment operations.

4. After 6 months from the initial opening of the refurbishment facility, Sharp and Servicer agree to review the above rates and reach mutual agreement on any appropriate rate changes.

5. In the event that Sharp and/or the servicer identifies product which is already within the servicer's facility and which is intended to be refurbished and Sharp instructs the servicer to scrap and to ship specific units back to Sharp's designated distribution center (s), Sharp agrees to receive invoices from Servicer which applies the above refurbishment rates for the specific identified units.

Sharp Electronics Corporation • 1300 Naperville Drive • Romeoville, IL 60446 • (630) 226-2600 • www.sharp-usa.com   **be sharp**

# SHARP

## ANNEX 2

1. Sharp agrees to receipt of a monthly invoice from Servicer regarding the rent pass through on the previously mentioned Reynosa facility.

| Year | 1 | 2 | 3 |
|---|---|---|---|
| Lease Rent. 80,380 sq. ft PSF Annual Triple Net Includes 750KVA | $5.40 (Billed for 60,000 sq. ft. only; use of 80,380 sq. ft.) | $5.40 (Billed for 60,000 sq. ft. only; use of 80,380 sq. ft.) | $5.28 (Billed for 80,380 sq. ft; use of 80,380 sq. ft.) |

2. The above lease rate also includes 750KVA usage provided by the Servicer. In the event that the refurbishing operations require additional KVA, Sharp will be responsible for the additional cost.

3. Sharp agrees to receipt of a monthly invoice from Servicer regarding CAM and applicable facility based operating expenses pass through on the previously mentioned Reynosa facility:

|  | Monthly Expense Estimate |
|---|---|
| CAM | $2,756.34 |
| Taxes | $1,029.75 |
| Insurance | $536.00 |
| VAT Taxes (10%) | $3,132.21 |
| Power Usage | $7,980.58 |
| Total | $15,494.88 |

Servicer will be responsible to provide supplies that are required to run their operation, such as PC's for office staff, office supplies, paper, cleaning supplies and materials. Servicer is also responsible for all appropriate facility cleaning services and necessary facility security ensuring the protection of all Sharp assets and consigned inventories.

**SHARP**

**(ANNEX 2 Continued)**

5. Sharp agrees to a monthly invoice regarding the below one-time start-up charges relating to initial training of Servicer staff at the previously mentioned Reynosa facility:

| Position | Training Time Weeks | Monthly Rate | Incremental Head Count | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Start Up HC | VCR HC | Cam HC | Audio HC | TV HC | Fax HC |
| Security Guard (24 hours per day) | 24 | $ 825.00 | NA | NA | NA | NA | NA | NA |
| Product Supervisor | 24 | $ 1,100.00 | 2 | 2 | 2 | 2 | 2 | 2 |
| Product Foreman | 4 | $ 610.00 | 0 | 1 | 0 | 1 | 1 | 1 |
| Parts | 4 | $ 430.00 | 1 | 0 | 0 | 0 | 0 | 0 |
| Technician | 4 | $ 420.00 | 4 | 2 | 5 | 5 | 1 | 6 |
| Inspector | 4 | $ 420.00 | 2 | 2 | 4 | 2 | 1 | 1 |
| General Labor | 1 | $ 260.00 | 5 | 5 | 3 | 3 | 2 | 8 |

| Position | One-Time Training Costs | | | | | |
|---|---|---|---|---|---|---|
| | Start Up | VCR | Cam | Audio | TV | Fax |
| Security Guard (24 hours per day) | $ 825.00 | $ 825.00 | $ 825.00 | $ 825.00 | $ 825.00 | $ 825.00 |
| Product Supervisor | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 |
| Product Foreman | $ - | $ 610.00 | $ - | $ 610.00 | $ 610.00 | $ 610.00 |
| Parts | $ 430.00 | $ - | $ - | $ - | $ - | $ - |
| Technician | $1,680.00 | $ 840.00 | $2,100.00 | $2,100.00 | $ 420.00 | $2,520.00 |
| Inspector | $ 840.00 | $ 840.00 | $1,680.00 | $ 840.00 | $ 420.00 | $ 420.00 |
| General Labor | $ 325.00 | $ 325.00 | $ 195.00 | $ 195.00 | $ 130.00 | $ 520.00 |
| Total | $6,300.00 | $5,640.00 | $7,000.00 | $6,770.00 | $4,605.00 | $7,095.00 |

6. Sharp agrees to reimburse Servicer for up to 5 trips taken by Servicer's employee identified as Mike Shimoma to the previously mentioned Reynosa facility. Additionally it is understood that Sharp's reimbursement to Servicer is estimated not to exceed $2,400 per trip. These trips are in order to facilitate the start up operations of the previously mentioned Reynosa facility. In order to be reimbursed for the expenses, Servicer must supply to Sharp the actual receipts for the trip. Below are the reimbursable trips.

| Dates (Approximate) | Purpose |
|---|---|
| March | Hire Accountant/HR/Import-Export/Production lay out |
| April | VCR training/Operations starts |
| May | Camcorder training/VCR |
| June | Additional product |
| July | New building start up |

Sharp Electronics Corporation • 1300 Naperville Drive • Romeoville, IL 60446 • (630) 226-2600 • www.sharp-usa.com   **be sharp**

JUN 28 2008 10:42AM   ST. PAUL TRAVELERS           913-681-9340           p.12

# SHARP.

## ANNEX 2

### A) Product and/or Accessories Inventory Accuracy

1) Total inventory is to be maintained with 100% accuracy, utilizing a location system. Spot inventory counts will be taken by Sharp, and each fiscal a full inventory report / verification is required. Discrepancies in inventory are to be investigated by the Servicer, with Sharp assistance; corrective adjustments are to be approved by Sharp.

2) In the event that a loss of product occurs for which the Servicer is liable to Sharp thereunder, Servicer's liability to Sharp will be an amount equal to Sharp's inventory cost, for the products and / or accessories lost or damaged, as reflected in Sharp's books at the date such damage or loss occurred.

### B) Parts Inventory Accuracy

1) Total inventory is to be maintained with 100% accuracy, utilizing a location system. Discrepancies in inventory are to be investigated by the Servicer, with Sharp assistance; corrective adjustments are to be approved by Sharp.

2) Cycle counts of 20% of the total line items are to be performed each month. All discrepancies are to be reviewed by Sharp and adjusted with Sharp approval.

3) At the end of each fiscal period, the total value of the adjustments will be compared to the total inventory value. The cost of variances of less than 0.5% will be absorbed by Sharp; over 0.5% will be billed to Bigston. The cost variances will be based on Sharp's parts inventory cost as reflected in Sharp's books at the date such damage or loss occurred.

Sharp Electronics Corporation • 1300 Naperville Drive • Romeoville, IL 60446 • (630) 226-2600 • www.sharp-usa.com   be .sharp.